## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:26-cv-00824-SKC-STV

Comcast Business Communications, LLC,

        Plaintiff,

v.

DISH Wireless L.L.C. and EchoStar Corporation,

        Defendants.

---

## DEFENDANT ECHOSTAR CORPORATION'S MOTION TO DISMISS
## PLAINTIFF'S COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

LEGAL STANDARD .................................................................................................. 4

I.     PENNSYLVANIA LAW GOVERNS PLAINTIFF'S TORTIOUS
       INTERFERENCE CLAIM .................................................................................. 4

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS
       INTERFERENCE UNDER PENNSYLVANIA LAW .......................................... 8
       A.    The Complaint Fails To Adequately Plead That EchoStar
             Caused DISH Wireless To Assert Any Contractual Defenses .................. 9
       B.    The Complaint Fails To Plead Tortious Interference Because It
             Is Not A Tort To Assert A Defense To Contractual Performance .......... 10
       C.    The Complaint Fails To Plead That EchoStar Acted Purposefully
             And With The Specific Intent To Harm Plaintiff's Contract .................. 11
       D.    The Complaint Fails To Plead Absence Of Privilege Or
             Justification ......................................................................................... 13

III.   THE COMPLAINT FAILS TO STATE A CLAIM UNDER COLORADO
       LAW ............................................................................................................... 16
       A.    The Complaint Fails To Plead That EchoStar Acted With The
             Specific Intent To Harm Plaintiff's Contract ........................................ 17
       B.    The Complaint Fails To Plead Improper Interference ............................ 18
       C.    Plaintiff's Allegations Establish That EchoStar's Conduct Was
             Privileged ............................................................................................. 19

CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abraham v. Thomas Jefferson Univ.*,
2024 WL 1120987 (E.D. Pa. Mar. 14, 2024) ............................................ 11, 12, 13

*ACS Investors, Inc. v. McLaughlin*,
943 S.W.2d 426 (Tex. 1997) ...................................................................... 10

*Acumed LLC v. Advanced Surgical Services, Inc.*,
561 F.3d 199 (3d Cir. 2009) ........................................................................ 5

*Affordify, Inc. v. Medac, Inc.*,
2020 WL 6290375 (D. Colo. Oct. 27, 2020) .............................................. 19

*Ascente Bus. Consulting, LLC v. DR myCommerce*,
2018 WL 3597674 (D. Minn. July 26, 2018) ............................................. 20

*Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.*,
321 F. Supp. 3d 503 (M.D. Pa. 2018) ....................................................... 14

*Avery Dennison Corp. v. Juhasz*,
924 F. Supp. 2d 893 (N.D. Ohio 2013) ....................................................... 7

*Boyd Rosene & Assocs., Inc. v. Kansas Mun. Gas Agency*,
123 F.3d 1351 (10th Cir. 1997) .................................................................. 5

*Brown v. Wilson*,
2014 WL 6806899 (D. Colo. Dec. 2, 2014) .................................................. 4

*Catahama, LLC v. First Commonwealth Bank*,
2011 WL 2533018 (W.D. Pa. June 24, 2011) ........................................... 13

*Covelo Clothing, Inc. v. Midcap Credit LLC*,
2018 WL 11714638 (Colo. App. Mar. 1, 2018) ......................................... 18

*Downtown Aspen Invs. v. Aspen Legacy Holdings*,
2011 Colo. Dist. LEXIS 2143 (Colo. Dist. Ct. Nov. 29, 2011) ............. 10, 18, 19, 20

*E. Rockhill Twp. v. Richard E. Pierson Materials Corp.*,
386 F. Supp. 3d 493 (E.D. Pa. 2019) ................................................... 13, 14

*eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.*,
519 F. Supp. 3d 1129 (S.D. Fla. 2021) ....................................................... 7

i

*eXp Realty, LLC v. Borough of Glenolden*,
  2024 WL 1806429 (E.D. Pa. Apr. 25, 2024) ........................................................ 12

*Fundient Inventory LLC v. Ouiby, Inc.*,
  2024 WL 3936668 (D. Colo. Aug. 26, 2024) ................................................... 18, 20

*Gerson v. Logan River Academy*,
  20 F.4th 1263 (10th Cir. 2021) ............................................................................ 19

*Green v. Interstate United Mgmt. Servs. Corp.*,
  748 F.2d 827 (3d Cir. 1984) ................................................................................. 16

*GT Resources LLC v. Black Hills Corp.*,
  2023 WL 12052529 (Colo. App. Oct. 19, 2023) ................................................... 19

*Gunn v. Carter*,
  2016 WL 7899902 (D. Colo. June 13, 2016) .......................................................... 6

*Hill v. Pub. Advocate of United States*,
  35 F. Supp. 3d 1347 (D. Colo. 2014) ..................................................................... 8

*Int'l Constr. Prods. LLC v. Caterpillar Inc.*,
  2020 WL 4584354 (D. Del. Aug. 10, 2020) ............................................................ 6

*James Cable, LLC v. Millennium Digital Media Sys., LLC*,
  2009 WL 1638634 (Del. Ch. June 11, 2009) ................................................... 10, 16

*Kansas Penn Gaming, LLC v. Collins*,
  656 F.3d 1210 (10th Cir. 2011) .............................................................................. 4

*MasTec Renewables Puerto Rico LLC v. Mammoth Energy Servs., Inc.*,
  2020 WL 6781823 (S.D. Fla. Nov. 18, 2020) .......................................................... 7

*Mele v. TSE Sys.*,
  2010 WL 3075741 (E.D. Pa. Aug. 5, 2010) .......................................................... 16

*Nairn v. JPMorgan Chase & Co.*,
  2025 WL 4091216 (D. Colo. Feb. 12, 2025) ........................................................... 5

*Nat. Wealth Real Estate, Inc. v. Cohen*,
  2006 WL 3500624 (D. Colo. Dec. 4, 2006) ............................................................. 6

*Newtek Small Bus. Fin., LLC v. Texas First Cap., Inc.*,
  644 F.Supp.3d 113 (E.D. Pa. 2022) .............................................................passim

*Peoples Mortg. Co. v. Fed. Nat. Mortg. Ass'n*,
  856 F. Supp. 910 (E.D. Pa. 1994) ........................................................................ 11

ii

*Pet Gifts United States, LLC v. Imagine This. Co., LLC,*
  2015 WL 570264 (D.N.J. Feb. 10, 2015) ................................................................ 7

*PPL Corp. v. Riverstone Holdings LLC,*
  2019 WL 5423306 (Del. Ch. Oct. 23, 2019)..................................................... 10, 16

*Prikis v. Maxatawny Township,*
  2024 WL 3889098 (E.D. Pa. Aug. 20, 2024) ......................................................... 12

*Redcloud Capital, LLC v. Fruition Partners, LLC,*
  2022 WL 20087990 (Colo. Dist. Ct. June 27, 2022) ............................................. 17

*Richardson v. Allstate Fire & Cas. Ins. Co.,*
  637 F. Supp. 3d 1186 (D. Colo. 2022)...................................................................... 4

*Ricoh USA, Inc. v. Innovative Software Sol., Inc.,*
  2020 WL 7024290 (E.D. Pa. Nov. 30, 2020) ......................................................... 13

*Rodriguez v. Bar-S Food Co.,*
  539 F. Supp. 710 (D. Colo. 1982)...................................................................... 5, 19

*S.J. Glauser DCJB, L.L.C. v. Porsche Cars N. Am., Inc.,*
  2006 WL 1816458 (D. Colo. June 30, 2006)........................................................... 18

*Shearin v. E.F. Hutton Grp.,*
  652 A.2d 578 (Del. Ch. 1994) ................................................................................ 20

*Simon Prop. Grp., Inc. v. Palombaro,*
  682 F. Supp. 2d 508 (W.D. Pa. 2010) .......................................................... 5, 9, 13

*Simply Snackin, Inc. v. S-L Distrib.,*
  2017 WL 6039734 (M.D. Pa. Dec. 6, 2017) ........................................................... 14

*Slayton v. Bayfield Sch. Dist.,*
  2024 WL 4979422 (D. Colo. Dec. 4, 2024) (Wang, J.).......................................... 19

*Tufco L.P. v. Reckitt Benckiser (ENA) B.V.,*
  2023 WL 4304751 (E.D. Wis. June 30, 2023) ................................................... 9, 10

*Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.,*
  28 F. Supp. 2d 947 (E.D. Pa. 1998)....................................................................... 14

*Westfield Dev. Co. v. Rifle Inv. Assocs.,*
  786 P.2d 1112 (Colo. 1990)..................................................................................... 17

*Windsor Secur., Inc. v. Hartford Life Ins. Co.,*
  986 F.2d 655 (3d Cir. 1993).................................................................................... 15

iii

## CERTIFICATE OF CONFERRAL

Pursuant to the Honorable S. Kato Crews Uniform Civil Practice Standard 7.1B(b), counsel for EchoStar Corporation conferred with counsel for Plaintiff regarding the requested relief to assess whether the defects could be cured through the filing of an amended pleading. Counsel for Plaintiff indicated that they oppose the motion.

## AI CERTIFICATION

Pursuant to the Court's Standing Order for Civil Cases, undersigned counsel certifies that generative artificial intelligence was not used to draft this filing.

## INTRODUCTION

Defendant EchoStar Corporation ("EchoStar"), and certain of its affiliates, historically provided DISH Wireless L.L.C. ("DISH Wireless") with access to EchoStar's wireless spectrum to support DISH Wireless's efforts to build out a 5G mobile network. DISH Wireless entered into agreements with parties, including Plaintiff Comcast Business Communications, LLC's ("Plaintiff" or "Comcast"), to provide services in connection with the 5G network buildout and operation.

In the summer of 2025, the Federal Communications Commission (the "FCC") instructed EchoStar that it had to sell its spectrum licenses or else have them revoked. EchoStar fought back against this mandate and worked diligently to maintain its spectrum licenses, but ultimately it had no choice but to sell the licenses to buyers approved by the FCC (the "Required Sales Transactions"). The Required Sales Transactions frustrated the purpose of DISH Wireless's contract with Plaintiff, constituted a force majeure event, and eliminated DISH Wireless's ability to pay for backhaul services it can no longer use.

Plaintiff filed a complaint against DISH Wireless for failure to make certain payments under the parties' agreement. Plaintiff also seeks a declaratory judgment that DISH Wireless's performance is not excused by the force majeure event triggered by the FCC's actions, or any other affirmative defense. Additionally, as is relevant here, Plaintiff sued EchoStar, DISH Wireless's indirect parent company, for tortious interference with DISH Wireless's contract with Plaintiff, effectively seeking unilaterally to impose a parent guarantee of DISH Wireless's contract on EchoStar that does not exist. Plaintiff's claim fails.

1

*One*, Plaintiff's claim is premised on its allegation that EchoStar "directed" DISH Wireless to assert force majeure and frustration of purpose defenses that Plaintiff claims are baseless. But the Complaint fails to adequately plead that EchoStar caused DISH Wireless to assert anything. Indeed, the Complaint does not identify any such communication. *See infra* Section II.A.

*Two*, causing one to assert contractual defenses to a contract cannot be tortious. Parties are free to raise defenses to contracts, which can be accepted or litigated. *See infra* Section II.B.

*Three*, under governing Pennsylvania law, Plaintiff does not allege that EchoStar acted with the intent to interfere with DISH Wireless's contract with Plaintiff, as required. In fact, Plaintiff alleges the opposite by acknowledging that EchoStar was motivated by its own "business interest" in seeking to sell its assets for "tens of billions of dollars" as "a business strategy" to protect its interest in its $40 billion investment in spectrum and related assets. *See infra* Section II.C.

*Four*, Plaintiff has the burden of affirmatively pleading that EchoStar's conduct with respect to its subsidiary, DISH Wireless, was neither privileged nor justified, which it fails to do. Indeed, the allegations here squarely fit within the privilege. *See infra* Section II.D.

*Five*, even if Colorado law applied, the Complaint fails to state a claim for many of the same reasons it fails under Pennsylvania law: it neither adequately alleges intentional interference by EchoStar, nor plausibly alleges that EchoStar's conduct was improper. Moreover, EchoStar's conduct would be protected by Colorado's

2

financial interest privilege, which shields a parent company's intervention in a subsidiary's affairs undertaken to protect its own legitimate financial interests. *See infra* Sections III.A–C.

As set forth more fully below, the claim for tortious interference against EchoStar must be dismissed.

## BACKGROUND

Beginning in 2019, DISH Wireless (and certain of its affiliates) began working to deploy a nationwide, first-of-its-kind cloud-native Open Radio Access Network-based 5G network. Compl. ¶¶ 2, 3, 21. That network relied on a portfolio of spectrum licenses and related assets that EchoStar Corporation, and certain of its affiliates (not including DISH Wireless) (collectively, the "EchoStar Group"), had acquired over a ten-year period, at a cost of over $30 billion, and to which EchoStar Group permitted DISH Wireless access. Compl. ¶¶ 2, 3. In connection with the 5G network buildout and operation, in April 2021, DISH Wireless and Comcast entered into the Master Service Agreement (the "MSA"). Compl. ¶¶ 2, 24.

By 2025, EchoStar had satisfied all applicable commitments to the FCC relating to the relevant spectrum licenses. Compl. ¶¶ 6, 37. But in the summer of 2025, the FCC abruptly took unprecedented and unforeseeable action that ultimately required EchoStar Group to sell the relevant spectrum licenses or have them revoked. Compl. ¶ 6. On May 9, 2025, the Chairman of the FCC sent a letter to EchoStar stating, among other things, that the FCC had initiated a review of EchoStar's licenses to provide 5G service in the United States and threatened the "loss of spectrum licenses and significant financial payments." Compl. ¶ 6.

3

As a result of the FCC's unprecedented and unforeseeable actions, which were unrelated to any of EchoStar Group's obligations to the FCC, EchoStar Group was required to enter into the Required Sales Transactions. Compl. ¶ 39. The Required Sales Transactions make it impossible for DISH Wireless to continue to build, operate, or pay for a wireless network. Compl. ¶ 42.

## LEGAL STANDARD

"The Tenth Circuit has instructed that to withstand a motion to dismiss, a complaint must have enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Brown v. Wilson*, 2014 WL 6806899, at *3 (D. Colo. Dec. 2, 2014); (citing *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1214 (10th Cir. 2011)). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. In other words, a plaintiff must offer sufficient factual allegations to raise a right to relief above the speculative level." *Id.* In determining whether a complaint states a plausible claim for relief, the Court must "draw on its judicial experience and common sense," and "should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Id.*

## I. PENNSYLVANIA LAW GOVERNS PLAINTIFF'S TORTIOUS INTERFERENCE CLAIM

"Any conflict of laws analysis begins, perforce, with a determination whether a conflict actually exists." *Richardson v. Allstate Fire & Cas. Ins. Co.*, 637 F. Supp. 3d 1186, 1190 (D. Colo. 2022). There is a true conflict here with respect to tortious interference. Under Pennsylvania law, the elements of a claim for tortious

interference are: (i) the existence of a contractual relation between the plaintiff and a third party; (ii) purposeful action by the defendant specifically intended to harm the existing contract; (iii) the absence of privilege to do so; and (iv) resulting damages. *Simon Prop. Grp., Inc. v. Palombaro*, 682 F. Supp. 2d 508, 511 (W.D. Pa. 2010). To state a claim for tortious interference with contract under Colorado law, a plaintiff must allege (1) existence of a valid contract between plaintiff and a third party; (2) knowledge by the defendant of this contract, or knowledge of facts which should lead him to inquire as to the existence of the contract; (3) intent by the defendant to induce a breach by the third party; (4) action by the defendant which induces a breach; and (5) damage to the plaintiff. *Nairn v. JPMorgan Chase & Co.*, 2025 WL 4091216, at *6 (D. Colo. Feb. 12, 2025).

Thus, while the majority of the elements of the cause of action are similar in both states, a conflict exists between Pennsylvania and Colorado because, "[w]hile some jurisdictions [such as Colorado] consider a justification for a defendant's interference to be an affirmative defense, Pennsylvania courts require the plaintiff, as part of his *prima facie* case, to show that the defendant's conduct was not justified." *Acumed LLC v. Advanced Surgical Services, Inc.*, 561 F.3d 199, 214 (3d Cir. 2009); *Rodriguez v. Bar-S Food Co.*, 539 F. Supp. 710, 718 (D. Colo. 1982) (under Colorado law, financial interest privilege is affirmative defense to tortious interference claim).

In resolving this conflict, the Court must apply the forum state's choice-of-law rules. *Boyd Rosene & Assocs., Inc. v. Kansas Mun. Gas Agency*, 123 F.3d 1351, 1352–53 (10th Cir. 1997). In tort cases, this Court applies the "most significant

5

relationship" test from the Restatement (Second) of Conflict of Law § 145, which requires courts to consider four factors: (i) where the injury occurred, (ii) where the conduct causing the injury occurred, (iii) the domicile, residence, place of incorporation, and place of business of the parties, and (iv) the place where the relationship between the parties is centered. *Gunn v. Carter*, 2016 WL 7899902, at *8 (D. Colo. June 13, 2016). Comment (e) to § 145 notes that the first factor—the location of the injury—should be given particular weight, as it "plays an important role in the selection of the state of applicable law…[p]rovided that the injury occurred in a single, clearly ascertainable, state." This is because "persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of state on account of the injury." *Id.*

Here, the first factor—where the injury occurred—is Pennsylvania. Plaintiff alleges the financial harm of lost contractual payments. The place where a plaintiff maintains its principal place of business is where economic injury is felt and, therefore, has the most significant relationship to the alleged injury. *See, e.g.*, *Nat. Wealth Real Estate, Inc. v. Cohen*, 2006 WL 3500624, at *3–4 (D. Colo. Dec. 4, 2006) (finding "plaintiffs suffered alleged injury predominantly…where they reside" and thus plaintiffs' "principal place of business [ ] has the most significant relationship to the alleged wrongdoing" in tortious interference claim); *see also Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 2020 WL 4584354, at *8 (D. Del. Aug. 10, 2020) ("[W]here the loss is pecuniary in nature, as it is in a tortious interference claim, the injury will normally be felt most severely at the plaintiff's headquarters or principal place of

6

business."); *eCapital Com. Fin. Corp. v. Hitachi Cap. Am. Corp.*, 519 F. Supp. 3d 1129, 1134 n.4 (S.D. Fla. 2021) (under § 145 test, plaintiff's principal place of business was where alleged economic injury was felt); *Avery Dennison Corp. v. Juhasz*, 924 F. Supp. 2d 893, 898 (N.D. Ohio 2013) (under § 145 test, applying law of plaintiff's place of business, which was location of injury from alleged interference). Here, Comcast is a Pennsylvania limited liability company, with its principal place of business there, so Pennsylvania is where the alleged economic injury was felt. Compl. ¶ 15.

As to the second factor, EchoStar is a Nevada corporation based in Colorado, but the Complaint does not allege a single, clearly centralized location from which the alleged interference occurred, so this factor does not outweigh Pennsylvania's connection to the alleged injury under the first factor. *See MasTec Renewables Puerto Rico LLC v. Mammoth Energy Servs., Inc.*, 2020 WL 6781823, at \*6 (S.D. Fla. Nov. 18, 2020) (under § 145, when alleged wrongful conduct was not centered in any single jurisdiction, second factor did not overcome first factor's strong connection to plaintiff's principal place of business); *Pet Gifts United States, LLC v. Imagine This. Co., LLC*, 2015 WL 570264, at \*4 (D.N.J. Feb. 10, 2015) ("While the Court knows that Defendants are citizens of Virginia, that fact alone is not enough to infer that the conduct causing Plaintiff's injury took place in Virginia.").

The third factor—the domicile, residence, place of incorporation, and place of business of the parties—is neutral. Comcast is a Pennsylvania limited liability company, with its principal place of business in Pennsylvania, and EchoStar is a Nevada corporation based in Colorado. *See* Compl. ¶¶ 15, 17; *MasTec Renewables*,

7

2020 WL 6781823, at *7 (finding third factor demonstrated significant relationship to state where plaintiff is headquartered).

The fourth factor—the place where the relationship between the parties is centered—is also neutral.  EchoStar has no relationship with Plaintiff other than through the alleged tortious interference.  *Hill v. Pub. Advocate of United States*, 35 F. Supp. 3d 1347, 1355 (D. Colo. 2014) (finding fourth factor to be neutral where "the only relationship between [plaintiffs] and [defendants] is that [plaintiffs] are victims of the alleged tort").  Indeed, the MSA's express exclusion of EchoStar from the definition of "Affiliates" confirms that the parties never intended to create any relationship between Plaintiff and EchoStar.  *See* Compl. Ex. A at 1.

In sum, because Pennsylvania has "the most significant relationship" with the tortious interference claim given that is the location of Plaintiff's alleged harm, and all other factors are neutral, Pennsylvania law applies.  Nevertheless, even if Colorado law applied, Plaintiff still fails to state a claim, as explained below.

## II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE UNDER PENNSYLVANIA LAW

Under Pennsylvania law, Plaintiff must adequately allege: (i) the existence of a contractual relation between the plaintiff and a third party; (ii) purposeful action by the defendant specifically intended to harm the existing contractual relation; (iii) the absence of privilege to do so; and (iv) resulting damages.  *Newtek Small Bus. Fin., LLC v. Texas First Cap., Inc.*, 644 F.Supp.3d 113, 121 (E.D. Pa. 2022).  The second and third elements are closely related, and courts often look at them together.  *Id.*

8

**A.     The Complaint Fails To Adequately Plead That EchoStar Caused DISH Wireless To Assert Any Contractual Defenses**

As an initial matter, Plaintiff has not alleged at all, much less adequately, that EchoStar "caused" DISH Wireless to assert its own defense to liability under the MSA. To the contrary, Plaintiff repeatedly pleads that it was harmed by acts by DISH Wireless, not by EchoStar. *See, e.g.*, Compl. ¶ 42 ("DISH [Wireless] sent Comcast a letter baselessly asserting that its contractual obligations were excused…"); ¶ 43 ("DISH [Wireless] also sent Comcast termination notices…"). The Complaint does not include a single well-pled, non-conclusory allegation as to how EchoStar "caused" DISH Wireless, a separate company, to do anything. *See Simon Prop. Grp.,* 682 F. Supp. 2d at 512 (W.D. Pa. 2010) (dismissing tortious interference claim based on conclusory statement); *see also Tufco L.P. v. Reckitt Benckiser (ENA) B.V.*, 2023 WL 4304751, at \*8 (E.D. Wis. June 30, 2023) (dismissing tortious interference claim where claimant asserted threadbare allegations that parent caused subsidiary to "falsely claim force majeure").

Instead, Plaintiff simply infers that, as a parent company, EchoStar must have given some unidentified amount of "direction." *See, e.g.*, Compl. ¶¶ 1, 10, 40. But alleged knowledge that a subsidiary has raised a contract defense does not constitute tortious interference, nor can Plaintiff simply infer that, as a parent company, EchoStar must have "directed" DISH Wireless to take any particular act. Indeed, under Plaintiff's theory, every parent company would be liable to its subsidiaries' contract counterparties if those subsidiaries raised liability defenses. This is not the law, and Plaintiff has not made any particular allegations to clear the high bar to

9

assert such a theory. "The test for holding a parent corporation liable for tortious interference has to be high or every-day consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases." *James Cable, LLC v. Millennium Digital Media Sys., LLC*, 2009 WL 1638634, at *4 (Del. Ch. June 11, 2009); *PPL Corp. v. Riverstone Holdings LLC,* 2019 WL 5423306, at *13 (Del. Ch. Oct. 23, 2019) (same).

### B.    The Complaint Fails To Plead Tortious Interference Because It Is Not A Tort To Assert A Defense To Contractual Performance

In addition to not pleading that EchoStar "directed" DISH Wireless to assert contractual defenses against Plaintiff, such conduct would not be tortious. Asserting a contractual defense—disputed or not—does not constitute tortious interference because it is not wrongful.

*Tufco* is illustrative. There, the plaintiff alleged that Griffin—the parent company of Tufco—tortiously interfered with Tufco's agreement by "causing or directing" its subsidiary to decline performance and to "falsely claim force majeure." 2023 WL 4304751, at *8. The court dismissed the claim, finding "no allegations of wrongful conduct by [the parent]" and holding that conclusory allegations of direction did not "provide the specificity required to cross the threshold from speculative to plausible." *Id*.; *see also Downtown Aspen Invs. v. Aspen Legacy Holdings*, 2011 Colo. Dist. LEXIS 2143, at *14–15 (Colo. Dist. Ct. Nov. 29, 2011) (dismissing tortious interference claim, noting that alleged "wrongful declaration of default…would not amount to a fraudulent misrepresentation or illegal conduct"); *accord ACS Invs., Inc.*

*v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) ("inducing a contract obligor to do what it has a right to do is not actionable interference").

Additionally, the Complaint includes no well-pled facts as to how the assertion of the disputed force majeure itself could have caused the *breach* of Plaintiff's contract with DISH Wireless. *See, e.g.*, Compl. ¶¶ 10, 40. Rather, the well-pled facts show that it was the sales of spectrum that caused DISH Wireless's inability to perform because it no longer had access to the spectrum. A *later* force majeure notice sent by DISH Wireless describing those *prior* events did not cause the alleged breach, it explained the defense. In short, Plaintiff's conclusory allegation that DISH Wireless's invocation of force majeure was "baseless" is a litigation position, not a tort.

## C.  The Complaint Fails To Plead That EchoStar Acted Purposefully And With The Specific Intent To Harm Plaintiff's Contract

Plaintiff complains about EchoStar's decision to enter into the underlying Required Sales Transactions, which had the incidental effect of frustrating the purpose of Plaintiff's contract with DISH Wireless and constituting a force majeure event. Compl. ¶ 40. But the fact that EchoStar's decision to enter the Required Sales Transactions had downstream effects on Plaintiff does not state a claim for tortious interference because those transactions were not made with the specific intent to harm Plaintiff, as required. *See, e.g.*, *Abraham v. Thomas Jefferson Univ.*, 2024 WL 1120987, at *50 (E.D. Pa. Mar. 14, 2024); *Peoples Mortg. Co. v. Fed. Nat. Mortg. Ass'n*, 856 F. Supp. 910, 932 (E.D. Pa. 1994) (no tortious interference where defendant's rescinding contract was "incidental consequence" of otherwise lawful conduct).

11

The Complaint does not even try to allege that EchoStar specifically intended to disrupt the MSA by undertaking the Required Sales Transactions. To the contrary, Plaintiff alleges that EchoStar pursued its own "business decision" by selling assets "worth billions of dollars" as "a business strategy" to protect its interest in its spectrum investment. Compl. ¶¶ 10, 12, 38, 39, 40, 48. The fact that the Required Sales Transactions may have some downstream effect on EchoStar's subsidiary's contract simply cannot establish tortious intent. *See eXp Realty, LLC v. Borough of Glenolden*, 2024 WL 1806429, at \*13 (E.D. Pa. Apr. 25, 2024) (dismissing tortious interference claim where plaintiff failed to allege purposeful action specifically intended to harm contractual relationship); *Newtek*, 644 F. Supp. 3d at 122–23 (dismissing tortious interference claim because complaint failed "to plausibly support an argument that [defendant] intentionally interfered with" contract); *Prikis v. Maxatawny Twp.*, 2024 WL 3889098, at \*10 (E.D. Pa. Aug. 20, 2024) (dismissing tortious interference claim because conclusory allegations of purposeful conduct and intent to harm are insufficient).

*Abraham* is instructive. In that case, a university initiated a Title IX sexual assault investigation into a physician who worked at the school. The university also notified the physician's private employer, which suspended the physician and then terminated his employment. 2024 WL 1120987, at \*50. The physician sued the university, alleging that the university tortiously interfered with his employment contract with his private employer by sharing the damaging sexual assault allegations that had been made against him. *Id.* at \*47. The court rejected the

12

physician's claim, holding that mere "knowledge that [one's actions] will have downstream effects" on a party's contract—without conduct specifically directed at harming that contract—cannot establish tortious intent. *Id.* at *50. As the court explained, harm that is merely "an incidental consequence" of a defendant's independently motivated conduct is insufficient to state a tortious interference claim. *Id.* at *49. The court further noted that "[t]he additional action evincing a malevolent intent is fundamental because…it will thus almost always be foreseeable to the supplying party that its failure to perform may well disrupt the business relations and opportunities of the receiving party." *Id.*

### D.    The Complaint Fails To Plead Absence Of Privilege Or Justification

In addition to tortious intent, "[u]nder Pennsylvania law, it is Plaintiff's burden, as part of the prima facie case, to show that Defendant acted without [privilege or] justification." *Catahama, LLC v. First Commonwealth Bank*, 2011 WL 2533018, at *6 (W.D. Pa. June 24, 2011). *Supra* Section I. Failure to do so requires dismissal. *E. Rockhill Twp. v. Richard E. Pierson Materials Corp.*, 386 F. Supp. 3d 493, 502 (E.D. Pa. 2019) (dismissing tortious interference claim where plaintiff failed to plead that conduct was not privileged); *Simon Prop. Grp.*, 682 F. Supp. 2d at 512 (plaintiffs' "blanket, conclusory statement" that "interference with their existing and prospective contracts was not privileged" was insufficient); *Ricoh USA, Inc. v. Innovative Software Sol., Inc.*, 2020 WL 7024290, at *13 (E.D. Pa. Nov. 30, 2020).

To establish an absence of privilege or justification, a plaintiff must show "not only that a defendant acted intentionally to harm the plaintiff, but also that those

13

actions were improper." *E. Rockhill Twp.*, 386 F.Supp.3d at 503. To determine whether the alleged conduct was "improper," courts consider the Restatement (Second) of Torts factors such as "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." *Newtek*, 644 F. Supp. 3d at 122. Here, Plaintiff fails to put forth *any* allegations that EchoStar lacked privilege or justification for its alleged interference, nor does it adequately allege that EchoStar's conduct was improper.

Courts have consistently held that a party pursuing its own business interests is not improper, and does not tortiously interfere with another's contracts. *Newtek Small Bus. Fin.*, 644 F.Supp.3d at 122–23 (dismissing tortious interference claim where defendant's "conduct was well within the range of normal for commercial transactions" and consistent with ordinary "profit-seeking" motives); *Simply Snackin, Inc. v. S-L Distrib.*, 2017 WL 6039734, at *7 (M.D. Pa. Dec. 6, 2017) (dismissing tortious interference claim where "the alleged intent of reducing distribution costs could be construed as a legitimate business interest"); *Audi of Am., Inc. v. Bronsberg & Hughes Pontiac, Inc.,* 321 F. Supp. 3d 503, 521 (M.D. Pa. 2018) (conduct in furtherance of legitimate business interest was privileged even assuming "purely personal and retributive motive"); *Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F. Supp. 2d 947, 952 (E.D. Pa. 1998) ("defendant's desire

14

to reduce costs or increase profits…will not support an intentional interference claim"). As the Third Circuit has observed: "[o]ur cases accord substantial deference to defendants whose conduct, despite its conflict with plaintiff's interest, protects an existing legitimate business concern." *Windsor Secur., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 665 (3d Cir. 1993). The courts have also "emphasized the importance of allowing actors freedom to protect their legitimate business interests." *Id.*

Here, the Complaint alleges that EchoStar sold spectrum licenses for billions of dollars in "highly profitable" and "self-serving and lucrative" transactions as part of a strategic "business decision," and that as a result of these sales, DISH Wireless invoked force majeure and frustration of purposes defenses under the MSA. *See, e.g.*, Compl. ¶ 38 ("EchoStar's spectrum sales thus were purely voluntary business decisions."), ¶ 40 ("EchoStar's change in business strategy"), ¶ 48 ("EchoStar's strategic business decision to abandon some of its 5G network plans does not excuse DISH's performance under the MSA based on force majeure or a frustration of purpose theory."). This is precisely the sort of "profit-motivated" conduct that does not support an "improper" interference. *Newtek*, 644 F.Supp.3d at 122–23.

*Newtek* is instructive. There, the plaintiff alleged that the defendant tortiously interfered with its security interest in a debtor's receivables by purchasing and collecting those receivables despite knowing they were subject to the plaintiff's senior liens. *Newtek*, 644 F.Supp.3d at 121. The court dismissed the claim, finding that the conduct was privileged under Pennsylvania law because it was "well within the range of normal for commercial transactions" and consistent with ordinary "profit-seeking"

15

motives, and that such conduct cannot satisfy the "improper" element regardless of its downstream effect on plaintiff's contract. *Newtek*, 644 F.Supp.3d at 122–23.

EchoStar's conduct is further insulated from liability by an independent privilege that applies specifically to corporate parents. "A parent company can interfere with its subsidiary's business relations to prevent dissipation of its subsidiary's assets or to ensure the financial stability of the subsidiary." *Mele v. TSE Sys.*, 2010 WL 3075741, at \*5 (E.D. Pa. Aug. 5, 2010); *see also Green v. Interstate United Mgmt. Servs. Corp.*, 748 F.2d 827, 831–32 (3d Cir. 1984) (parent company's conduct was privileged where it instructed wholly-owned subsidiary not to execute lease "to prevent dissipation of the [subsidiary's] resources"). Here, EchoStar's alleged direction to DISH Wireless to assert a force majeure defense—even if true— is a privileged parental intervention protected under Pennsylvania law: a corporate parent acting to shield its subsidiary from performing a contract whose purpose has been frustrated or rendered impossible and would thus only lead to the "dissipation of [the] subsidiary's resources." *Id.* at 831; *see also James Cable*, 2009 WL 1638634, at \*4 (no tortious interference "when the companies act in furtherance of their shared legitimate business interests"); *PPL Corp.*, 2019 WL 5423306, at \*13 (test for tortious parental interference must be high otherwise parents would always be sued in contract cases).

## III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER COLORADO LAW

Even if Colorado law applies, Plaintiff's claim still fails because, under Colorado law, in addition to pleading that EchoStar caused DISH Wireless to breach

16

(which, as set forth above, the Complaint fails to do, *supra* Section II.A), Plaintiff must show that "[t]he interference [was] both intentional and improper." *Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112, 1117 (Colo. 1990). Plaintiff alleges neither.

### A. The Complaint Fails To Plead That EchoStar Acted With The Specific Intent To Harm Plaintiff's Contract

To show "intentional" interference, Plaintiff must plead that the defendant acted for the purpose of causing the alleged breach. *Redcloud Capital, LLC v. Fruition Partners, LLC*, 2022 WL 20087990, at *4 (Colo. Dist. Ct. June 27, 2022). In *Redcloud*, the court dismissed a tortious interference claim because plaintiffs failed to allege that the defendants intended to cause the breach—as opposed to merely intending to commit the underlying act. *Id.* at *4 (finding that "knowledge alone is not enough to establish intent" and "[plaintiff] must also demonstrate in the pleadings that [defendant] intended to cause [third-party] to breach the [agreement]"). The court emphasized that the focus of the intent element is on the intended result, not the intended conduct: "The essential thing is the intent to cause the result. If the actor does not have this intent, his conduct does not subject him to liability . . . even if it has the unintended effect of deterring the third person from dealing with the other." *Id.* (quoting Restatement (Second) of Torts § 766, cmt. h). Because the plaintiffs alleged only that the defendants knew of the contract and intentionally engaged in conduct that would incidentally result in a breach—not that they specifically intended to cause a breach—the court found no tortious intent. *Id.*

Here, as addressed above, the Complaint does not allege that EchoStar specifically intended to disrupt the MSA by undertaking the Required Sales Transactions, which resulted in DISH Wireless invoking the force majeure. *See supra* Section II.C. Instead, the Complaint pleads the opposite, alleging that EchoStar undertook legitimate business transactions for its own economic interests. *See, e.g.*, Compl. ¶¶ 38, 40. This is insufficient to state a claim.

## B. The Complaint Fails To Plead Improper Interference

Plaintiff has also failed to plead that EchoStar's conduct was improper. To determine whether the conduct was "improper," Colorado courts consider the Restatement (Second) of Torts factors. *See supra* Section II.D; *Fundient Inventory LLC v. Ouiby, Inc.*, 2024 WL 3936668, at *3 (D. Colo. Aug. 26, 2024). Plaintiff alleges that EchoStar's decision to divest spectrum assets was driven by its own economic interests, which is, by definition, not "improper." *See Covelo Clothing, Inc. v. Midcap Credit LLC*, 2018 WL 11714638, at *5 (Colo. App. Mar. 1, 2018) (no tortious interference where defendant engaged in sale "to protect its own business interests"); *S.J. Glauser DCJB, L.L.C. v. Porsche Cars N. Am., Inc.*, 2006 WL 1816458, at *12 (D. Colo. June 30, 2006) (no tortious interference where defendant's conduct constituted "potentially valid business position").

And even if the Complaint had sufficiently pled that EchoStar directed DISH Wireless to assert the contract defenses against Plaintiff, such conduct would not be improper. S*ee supra* Sections II.B and II.D; *Downtown Aspen*, 2011 Colo. Dist. LEXIS 2143, at *14–15 (no tortious interference because alleged "wrongful declaration of a default…would not amount to a fraudulent misrepresentation or illegal conduct").

18

### C. Plaintiff's Allegations Establish That EchoStar's Conduct Was Privileged

The tortious interference claim also fails because any such alleged interference would be protected by Colorado's financial interest privilege,[1] which applies where the defendant (i) had a legitimate business interest in the challenged conduct and (ii) employed no wrongful means in pursuing it.[2]

*First*, the Complaint clearly alleges EchoStar had a legitimate business interest in the challenged conduct. *See, e.g.*, Compl. ¶ 10 (characterizing conduct as "EchoStar's change in business strategy"), ¶ 40 (same), ¶ 12 (The Required Sales Transactions were "EchoStar's voluntary and self-motivated business decision."), ¶ 38 ("EchoStar's spectrum sales thus were purely voluntary business decisions."), ¶ 48 ("EchoStar's strategic business decision to abandon some of its 5G network plans does

---

[1] Colorado appellate and trial courts have recognized a financial interest privilege. *See GT Resources LLC v. Black Hills Corp.*, 2023 WL 12052529, at *10 (Colo. App. Oct. 19, 2023) (reversing for failure to instruct jury on privilege); *Affordify, Inc. v. Medac, Inc.*, 2020 WL 6290375, at *5 (D. Colo. Oct. 27, 2020); *Rodriguez*, 539 F. Supp. at 718; *Downtown Aspen*, 2011 Colo. Dist. LEXIS 2143, at *14–15 (dismissing tortious interference claim under privilege). None of these courts differentiated between the privilege's application to prospective relations or existing contract claims. *See GT Resources*, 2023 WL 12052529, at *10 (noting that "a parent company's interference with a **subsidiary's contract** is privileged") (emphasis added); *Affordify*, 2020 WL 6290375 at *5 (discussing privilege in context of "parent's interference with a **subsidiary's contract**") (emphasis added); *Rodriguez*, 539 F. Supp. at 718 (discussing privilege in tortious interference with existing contract).

[2] While some courts in Colorado have found the financial interest privilege to be an affirmative defense, *see Rodriguez*, 539 F. Supp. at 718., the Tenth Circuit has explained that dismissal based on an affirmative defense is appropriate, where, as here, "the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements." *Gerson v. Logan River Academy*, 20 F.4th 1263, 1268 (10th Cir. 2021); *see also Slayton v. Bayfield Sch. Dist.*, 2024 WL 4979422, at *2–4 (D. Colo. Dec. 4, 2024) (Wang, J.) (dismissing complaint because affirmative defense is "apparent on the face" of complaint).

not excuse DISH [Wireless]'s performance under the MSA based on force majeure or a frustration of purpose theory."); *see also supra* at II.C and II.D.  These allegations are quintessential financial-interest conduct.  *See Downtown Aspen Invs.*, 2011 Colo. Dist. LEXIS 2143, at *14–15 (dismissing tortious interference claim under "financial interest" privilege); *Ascente Bus. Consulting, LLC v. DR myCommerce*, 2018 WL 3597674, at *6 (D. Minn. July 26, 2018) (dismissing interference claim against parent where financial interest was apparent on face of complaint); *accord Shearin v. E.F. Hutton Grp.*, 652 A.2d 578, 590 (Del. Ch. 1994) ("The privilege arises when the parent pursues lawful action in the good faith pursuit of its profit making activities.").

*Second*, Plaintiff has not pled that EchoStar employed wrongful means. Colorado courts define "wrongful means" as including "physical violence, fraudulent misrepresentation and threats of illegal conduct."  Restatement (Second) of Torts § 767, cmt. c; s*ee also Fundient*, 2024 WL 3936668 at *3.  Plaintiff alleges no such conduct by EchoStar. *See id.* (conclusory allegations of improper interference without alleging threats, economic pressure, violation of business norms, or other wrongful means are insufficient).  To the contrary, Plaintiff admits the Required Sales Transactions were a "business decision" undertaken by EchoStar for its own economic interests, and raising a defense to a contract is not unlawful.  *See, e.g.*, Compl. ¶¶ 39, 48; *supra* Section II.B, II.C, and II.D.

## CONCLUSION

For the foregoing reasons, EchoStar respectfully requests that the Court dismiss the Complaint with prejudice, and grant such further relief as the Court deems proper.

Dated:  April 13, 2026

Respectfully submitted,


*/s/ Glenn M. Kurtz*
Hugh Q. Gottschalk
Jacob A. Rey
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone: 303.244.1800
Facsimile:  303.244.1879
Email: gottschalk@wtotrial.com
       rey@wtotrial.com

Glenn M. Kurtz
Joshua D. Weedman
Robert E. Tiedemann
Camille M. Shepherd
White & Case LLP
1221 Avenue of the Americas
New York, NY 10020-1095
Telephone: 212.819.8200
Email: gkurtz@whitecase.com
      jweedman@whitecase.com
      rtiedemann@whitecase.com
      camille.shepherd@whitecase.com

Attorneys for EchoStar Corporation

21

## CERTIFICATE OF SERVICE ECF

I HEREBY CERTIFY that on April 13, 2026, I electronically filed the foregoing Defendant EchoStar Corporation's Motion to Dismiss Complaint with the Clerk of Court using the ECF system which will serve notice on all counsel of record in this case.

/s/Glenn M. Kurtz
Glenn M. Kurtz